IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

DANIEL J. ZEDAN,                          :
                                          :
        Plaintiff,                        :
                                          :
v.                                        :          CASE NO.: 7:19-CV-45 (WLS)
                                          :
MATTHEW JAMES BAILEY,                     :
                                          :
        Defendant.                        :
_____ :

## ORDER

This matter is before this Court for a determination of an appropriate award to be entered following a grant of default judgment.

## I.    Background

Plaintiff Daniel Zedan brought this action against Defendant Matthew James Bailey on March 20, 2019 alleging libel, slander, and intentional infliction of emotional distress[1] and seeking an injunction that Bailey cease his wrongful conduct, compensatory damages of no less $75,000, attorney's fees, and costs. (Doc. 1.) In his Complaint, Plaintiff asserts that he is a resident of the State of Illinois and that Bailey is a resident of Lowndes County, Georgia and that a substantial part of the events giving rise to Zedan's claim occurred in this judicial district. *Id.* ¶¶ 1, 2, 5. Bailey answered the Complaint on April 15, 2019 asserting that he had not committed the wrongful acts alleged, that he was "afforded the freedom to write about public figures such as Mr. Zedan," that he was "not served in the correct manner," and that this is not "the correct court venue." (Doc. 13.) Bailey provided an address of record in Pelham, Georgia.[2] Bailey also moved the Court to appoint him counsel, which the Court denied. (Docs. 14 & 16.)

---

[1] At the hearing held on August 5, 2020, Plaintiff moved to withdraw his claim for intentional infliction of emotional distress, which the Court granted. (*See* Doc. 50 at 5.)
[2] Pelham, Georgia is within the jurisdiction of this Court.

On April 16, 2019, the Parties were noticed to appear and attend a scheduling and discovery conference at the Court on June 11, 2019. (Doc. 15.) Bailey did not attend the conference and did not seek an excuse or continuance from the Court in advance; as such, the conference proceeded and Bailey was noticed via a written order that "further failure to appear or comply with Court orders may subject Bailey to sanctions." (Doc. 18 at 1 n.1.) The Court entered a discovery order on June 12, 2019. (Doc. 18.) On June 24, 2019, the Court received a letter from Bailey stating that he was unable to attend the conference because he was attending college in New England and he requested that the Court postpone the case until he was "available to defend [him]self, or find adequate representation." (Doc. 19.) The Court denied Bailey's request but allowed him until August 12, 2019 to notify the Court whether he had retained counsel or would proceed *pro se*, notifying him that "he remains at all times responsible for his defense in this matter unless and until he has retained counsel." (Doc. 20.) Bailey did not respond to the Court's order. (*See* docket.)

On August 16, 2019, Zedan moved to compel Bailey to provide mandatory initial disclosures and responses to Plaintiff's Interrogatories and Request for Production of Documents. (Doc. 23.) Because Defendant appeared to be proceeding *pro se*, the Court noticed him of the procedures for responding to the motion to compel and the consequences of failing to do so, which included that Bailey could be sanctioned by an entry of default judgment and be required to pay the movant's reasonable expenses incurred in making the motion. (Doc. 24.) Bailey filed no response to the motion to compel, and the Court granted the motion, ordering that Bailey "provide to Plaintiff full and adequate initial disclosures as required by Rule 26(a), responses to Plaintiff's interrogatories, and document productions **immediately and no later than Tuesday, October 8, 2019**." (Doc. 25 at 2.) The Court also warned Bailey "that failure to comply with this Order may subject him to the drastic sanction of default judgment being entered against him without further notice." *Id.* at 2-3. Finding that it would be difficult for Bailey to attend a hearing, the Court set a telephone conference so that Bailey could be heard on the issue of whether further sanctions should be ordered against him and on a reasonable amount of attorney's fees. *Id.* at 3.

Although Bailey had previously stated that he would not attend the telephone conference, Bailey did attend and he informed the Court that he had not responded to the discovery requests because it was difficult for him to read the "legalese" and he had not studied the law. *See* Doc. 27 at 1. The Court inquired into the nature of the discovery requests Plaintiff had served, and Plaintiff's counsel responded that they mostly requested that Bailey identify his alleged sources of information. *Id.* Bailed admitted that such requests were not legalese but that he preferred that Plaintiff's counsel explain the requests orally to him. *Id.* The Court explained that this is a formal legal proceeding and that each party has the right to signed, sworn discovery responses. *Id.* at 2. The Court explained that Bailey has a responsibility to respond to discovery requests, and that if he does not respond, he can be subject to sanctions, including a money judgment against him. *Id.* The Court stated that it was because of the seriousness of this proceeding that the Court has suggested in prior orders that Bailey take the appropriate steps to defend himself or secure legal counsel. *Id.* The Court stated that its orders and the rules must be complied with. *Id.* After Plaintiff's counsel requested fees totaling $2,272.50 at a rate of $505 per hour to be paid within ten days, Bailey replied that he would not pay fees because he did not have the money. *Id.* at 2. The Court took the fee request under advisement. The Court also extended the discovery deadline to January 9, 2020 (after the holidays), to allow Bailey time to engage in discovery, but clarified that "Bailey's initial disclosures as required by Rule 26(a), responses to Plaintiff's interrogatories, and document productions remain due no later than **Tuesday, October 8, 2019**." *Id.* at 2-3.

On October 9, 2019, Zedan filed a second and supplementary Motion to Compel, asserting that Bailey had still not provided the ordered discovery. (Doc. 28.) Plaintiff sought attorney's fees and an order striking Bailey's Answer and entering default judgment against Bailey on liability, an injunction requiring Bailey to remove the slanderous statements from his website, and a trial on damages and attorney's fees. (Doc. 28 at 6.) Although the Court again noticed Bailey of the second motion to compel and of the consequences of failing to respond, Bailey filed no response. (Doc. 30.) The Court granted Plaintiff default judgment on his claims of libel and slander– such that Bailey's Answer was stricken and he was deemed to admit the well-pled allegations in the Complaint— and denied without prejudice Plaintiff's request for

an injunction. (Doc. 32 at 12.) The Court ordered that Bailey pay to Plaintiff's counsel $1,575.00 in attorney's fees for the time expended on the first motion to compel no later than Friday, January 17, 2020 based on 4.5 hours spent on that motion at a rate of $350 per hour. *Id.* at 11-12. The Court stated that it would hear from Bailey at the damages hearing on the fees requested for 0.6 hours for the telephone conference on the first motion to compel and 1.5 hours for the second motion to compel. *See id.* The Court subsequently granted-in-part Zedan's third motion to compel based on Bailey's failure to attend a reasonably noticed deposition without substantial justification and stated that it would determine the appropriate sanctions to be entered on the second and third motions to compel by separate order. *Id.*; Doc. 54.

In the order granting default judgment to Plaintiff, the Court set a hearing for February 19, 2020 to "hear from Bailey on all remaining issues," including Plaintiff's request for attorney's fees on the motions to compel, and to hear from the Parties on "compensatory and punitive damages," "attorney's fees and costs, and the appropriate scope of any injunction to be issued." (Doc. 32 at 12.) On February 18, 2020, Defendant filed an "Emergency Motion to Continue" the hearing, in which Defendant's newly-retained attorney stated that Defendant had hired him that day and that he had only just learned about the hearing scheduled for the next day. (Doc. 40.) Based on this motion, the Court continued the hearing to April, but because of the risks posed by the COVID-19 pandemic, the hearing was ultimately continued to August 5, 2020. (Docs. 44, 45, 46.) At the August 5th hearing, the Court restated the purpose of the hearing and also notified Bailey that "this would be the time for him to provide any evidence" on the motions to compel, such as appropriate attorney's fees, and he declined to do so. (Doc. 50 at 89:21-91:1.) The Parties have now timely filed briefs following the hearing, containing their proposed findings of fact, conclusions of law, and supporting legal arguments. (*See* Docs. 51, 52, 53.) The Court will analyze all remaining issues in turn.

## II.   Discussion

### A. Challenged Pleadings

Defendant argues that the Court should deny default judgment for the relief requested on Plaintiff's claims. (Doc. 52.) Defendant posits that Plaintiff has failed to plead libel because

the statements alleged to constitute libel are not defamatory on their face and do not indicate that Plaintiff was charged with a crime, such as to constitute libel under Georgia law. *Id.* at 6-11. Defendant argues that none of the posts of which Plaintiff complains constitute actual defamation unless the Court impermissibly resorts to "innuendo," especially because the entire posts are not attached to the Complaint and the statements lack context. *Id.* at 9-11. He further contends that Plaintiff's allegation that "upon information and belief" Bailey repeated his defamatory statements orally are insufficient to support an entry of default judgment for slander. *Id.* at 13 (citing cases). Defendant argues that because Plaintiff's claims of libel and slander are insufficiently pled, the Court cannot award attorney's fees, punitive damages, or injunctive relief. *Id.* at 13-14; Doc. 53.

Because the Court has already concluded that Plaintiff's allegations of libel and slander are well-pled and has entered default judgment for Plaintiff on those claims (Doc. 32), Defendant is essentially asking the Court to set aside the entry of default judgment, which the Court can do for good cause. Fed. R. Civ. P. 55(c). **Further,** "[t]he entry of a default judgment is committed to the discretion of the district court." *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1576 (11th Cir. 1985).

To successfully plead a claim for libel in Georgia, a plaintiff must allege that he was subjected to false and malicious defamation, through published print or writing, tending to injure his reputation and expose him to public hatred, contempt, or ridicule. O.C.G.A. § 51-5-1(a). "A libel is published as soon as it is communicated to any person other than the party libeled." O.C.G.A. § 51-5-3. To state a claim for slander in Georgia, a plaintiff must allege oral defamation, including making charges about the plaintiff's trade, office, or profession, calculated to injure him or speaking other disparaging words that naturally create "special damage." O.C.G.A. § 51-5-4(a). Damage is "inferred" for making charges against another's trade, office or profession, but special damage must be established for speaking other "disparaging words." O.C.G.A. § 51-5-4(b). In other words, making charges against another's trade, office or profession is considered defamation per se for a claim of libel or slander. *Cottrell v. Smith*, 788 S.E.2d 772, 781 (Ga. 2016). To constitute defamation regarding one's trade, profession, or office, the defamation "must be one that is especially injurious to the plaintiff's

reputation because of the particular demands or qualifications of plaintiff's vocation… . of such a nature such as to charge him with some defect of character or lack of knowledge, skill, or capacity as necessarily to affect his competency successfully to carry on his business, trade, or profession." *Id.* at 781-82 (citation omitted). A statement asserting a single instance of misconduct is insufficient to constitute defamation. *Id.*

Defendant argues that "[t]he test to determine whether an allegedly defamatory statement is actionable requires examination of 'the statement in its totality in the context in which it was [] published.'" (Doc. 52 at 7) (quoting *Smith v. Stewart*, 660 S.E.2d 822, 830 (Ga. Ct. App. 2008)). But, ironically, Defendant has taken *Smith* out of context. *Smith* concerned a character in the defendant's purportedly fictional book, and the court found that there was a fact question for the jury whether the character was actually the plaintiff. *Smith*, 660 S.E.2d 822. In finding that the full context of the allegedly libelous statements must be examined, the court further explained that "if the allegedly defamatory statement could not be reasonably understood as describing actual facts about the plaintiff or actual events in which he participated, the publication will not be libelous." *Smith*, 660 S.E.2d at 830 (citation omitted).[3] Even there, the court found the allegedly defamatory statements "sufficiently plausible and factual that they could be proven true or false;" and thus, they presented a factual question for a jury. *Id.*

But this Court is not at the summary judgment stage where a different legal standard applies. To enter default judgment, the Court need only find that "there is 'a sufficient basis in the pleadings for the judgment entered[,]' [which is] akin to that necessary to survive a motion to dismiss for failure to state a claim." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (citations omitted).

---

[3] In other words, the only question in Smith was whether the libel could be considered factual as "a defamation action will lie only for a statement of fact." *Gettner v. Fitzgerald*, 677 S.E.2d 149, 153-54 (Ga. Ct. App. 2009) ("An opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false.") (citation omitted). This is the context in which the *Smith* court found that context mattered. Here, the allegedly defamatory statements are sufficiently pled as factual statements.

Plaintiff Daniel Zedan alleges that he is a principal in a business that sells tree nuts, including pecans, and that he is a board member of the American Pecan Council ("APC"). (Doc. 1 ¶¶ 6-8.) Plaintiff alleges that from March 2018 through March 2019, Defendant Matthew James Bailey published online through his blog "pecanreport.com" and orally communicated various false statements about Plaintiff, including that Plaintiff is the co-founder of a business that has been accused of stealing "pecans worth millions of dollars" from pecan growers, was involved in a "scam," had a "malevolent agenda," and, in an article titled "High Level Fraud in the Pecan Industry," that Plaintiff said all U.S. shellers used Mexican pecans. (Doc. 1 ¶¶ 12-17.) Plaintiff alleges that these statements have exposed him to public hatred, contempt or ridicule and that they were knowingly false when made. *Id.* ¶¶ 18-19. While not all of the statements mentioned in Plaintiff's complaint would state a claim, the aforementioned statements are sufficient to state a claim for defamation per se because they relate to Plaintiff's business, trade, and profession, and they facially appear to be injurious factual statements of ongoing misconduct by Plaintiff in his profession. That is all that is required. *See, e.g.*, *Floyd v. Atlanta Newspapers*, 117 S.E.2d 906, 909 (Ga. Ct. App. 1960); *Smith*, 660 S.E.2d at 830-31; *Bellemeade, LLC v. Stoker*, 631 S.E.2d 693, 696 (Ga. 2006) ("[A] statement of 'opinion' is actionable as defamatory if it can reasonably be interpreted as stating or implying defamatory facts about the plaintiff and, if so, if the defamatory assertions are capable of being proved false.")[4]

There is no requirement that a complaint for libel contain the full written material(s) in which the libelous statements are made. Further, alleging that someone "stole" is unambiguous on its face and can state a claim for defamation per se, at least at the pleading stage. *See, e.g.*, *Cate v. Patterson*, 840 S.E.2d 489, 493 (Ga. Ct. App. 2020) (finding that the "plain import" of the words "'taken … without proper ownership' . . . impute the criminal offense of theft to the plaintiffs); *Mullinax v. Miller*, 531 S.E.2d 390, 392 (Ga. Ct. App. 2000) ("There is no

---

[4] Similarly, "[t]he Restatement now lists four elements in a cause of action for defamation: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the 'actionability of the statement irrespective of special harm.'" *Mathis v. Cannon*, 276 Ga. 16, 20-21, 573 S.E.2d 376, 380 (2002) (citation omitted). These elements are also satisfied in the Complaint.

question that the allegedly libelous sentence stating that plaintiffs 'stole' Brown's taxes was published in the local newspaper[;]" the only question was who published it.); *ACLU v. Zeh*, 845 S.E.2d 698, 702 (Ga. Ct. App. 2020) (finding that plaintiff established a prima facie case of defamation per se where he alleged that defendant falsely stated plaintiff "'extorted' his clients," which "implies an assertion of objective fact"). The context in which defamatory statements were made and the inferences to be drawn therefrom are issues for a factfinder, not for a court determining the sufficiency of the pleadings.[5]

Further, even where statements may not constitute defamation per se, they can still constitute defamation if they are alleged to be false, factual statements and special damage is pled. *Connell v. Houser*, 375 S.E.2d 136, 139 (Ga. Ct. App. 1988) ("[S]pecial damages must be shown to establish a cause of action based on mere derogatory remarks"). In a defamation action, special damage means "the loss of money or some other material temporal advantage capable of being assessed in monetary value," including "entertainment and hospitality." *McGee v. Gast*, 572 S.E.2d 398, 401 (Ga. Ct. App. 2002) (citation omitted). Injury to one's business reputation is traditionally considered special damage. *See, e.g.*, *Floyd*, 117 S.E.2d at 909 (finding that the title and content of an article "taken together alleges a sufficient factual basis to support the conclusions that the article was intended to be and was understood by the average reader as conveying a slur upon the plaintiff's character and reputation," and that dismissal of the case was error). Here, Plaintiff has alleged that Bailey's defamatory statements injured his reputation, and special damages are sought. (Doc. 1 at 7-9.)[6] Thus, for this additional reason, Plaintiff has properly alleged defamation.

As to Plaintiff's slander claim, there may be situations where a court may accept an allegation of slander "upon information and belief," such as "'where the facts are peculiarly within the possession and control of the defendant.'" *Boateng v. Ret. Corp. of Am. Partners, L.P.*,

---

[5] *Cf. Mathis v. Cannon*, 573 S.E.2d 376, 383 (Ga. 2002) (finding that no person could "reasonably interpret the incoherent messages" posted on a message board and referring to defendant as a thief "as stating actual facts" and that defendant was not due summary judgment on liability as a result). The circumstances of *Mathis* differ from those here, and the Court has no reason to conclude that Plaintiff has failed to state a claim for libel.

[6] To the extent it matters per Fed. R. Civ. P. 55(b)(2)(C), Plaintiff's testimony and evidence at the damages hearing supported the truth of his allegations that Bailey published false remarks that caused Plaintiff to sustain business losses. (Doc. 50 at 55-56, 58-59, 71-72.)

No. 1:12-cv-01959-JOF, 2013 U.S. Dist. LEXIS 197898, at *11 (N.D. Ga. Mar. 5, 2013) (citing cases). But a court "do[es] not have to take as true allegations based merely 'upon information and belief.'" *Smith v. City of Sumiton*, 578 F. App'x 933, 935 n.4 (11th Cir. 2014). Indeed, "[i]f there is no evidence of any specific words or statements uttered by [the defendant], there can be no finding that he published a slander." *Itt Rayonier v. McLaney*, 420 S.E.2d 610, 612 (Ga. Ct. App. 1992). Given that Plaintiff alleges without specific facts that Defendant repeated his libel orally, the Court finds good cause to deny an entry of default judgment on the claim of slander. But that does not change the outcome of this case as the Complaint was centered on the alleged written defamation, which was sufficiently pled in detail.[7] Thus, for purposes of resolving the issue of damages and because specific facts are not alleged to establish that Defendant orally defamed Plaintiff, the Court will treat only Plaintiff's claim of libel as well-pled.

For the foregoing reasons, the Court finds that Plaintiff has sufficiently pled Count I for libel and that default judgment against Defendant on the libel claim is appropriate. Thus, the Court will proceed to determining the relief to be awarded.[8]

### B. Damages

Plaintiff testified at the damages hearing that he wants the following from the Court: (1) a declaratory judgment that Bailey maliciously and falsely defamed him; (2) attorneys' fees for his local and Chicago attorneys; (3) that Bailey remove the posts from the internet; (4) compensatory damages of at least $25,000; and (5) $100,000 in punitive damages. (Doc. 50 at 55, 74.) In his counsel's post-hearing briefing, Plaintiff filed proposed conclusions of law that Bailey is guilty of libel and slander and requesting $30,000 in general and special damages, $28,964.34 in attorney's fees and expenses, and $100,000 in punitive damages.

---

[7] Indeed, Plaintiff's counsel testified that there is no way for him to apportion fees separately for the libel and slander claims as they "substantially overlap[ed]" and "the facts are intertwined." (Doc. 50 at 87.) This will be addressed further herein.

[8] Moreover, Defendant presented no further argument or evidence concerning jurisdiction at the damages hearing or thereafter. Based on the well-pled allegations regarding jurisdiction, and for the reasons previously explained by the Court (Doc. 39), the Court finds that it has jurisdiction to resolve this case.

i.       **General and Special Damages**

"Plaintiffs who are 'private persons' must only prove that the defendant acted with ordinary negligence." *Atlanta Journal-Constitution v. Jewell*, 555 S.E.2d 175, 183 (2001)[9]; *Macon Tel. Pub. Co. v. Elliott*, 302 S.E.2d 692, 695 (1983) (citing *Gertz v. Robert Welch*, 418 U.S. 323, 348 (1974)) ("[A] private (as opposed to a public figure or public official) defamation plaintiff may recover actual damages without a showing of actual malice." In Georgia, "malice is inferred from the character of the charge." *Hayes v. Irwin*, 541 F. Supp. 397, 440 (N.D. Ga. 1982) (explaining that under Georgia law, malice "is inferred by law from the character of the defamation where there is an absence of lawful excuse or the absence of privilege"). If proof is established to rebut malice, "such proof shall be considered in mitigation of damages." O.C.G.A. § 51-5-5.

In tort actions in Georgia, "[d]amages may be either general or special, direct or consequential." O.C.G.A. § 51-12-1. "General damages are those which the law presumes to flow from any tortious act" and which do not require proof; while "[s]pecial damages are those which actually flow from a tortious act" and which must be proved to be recovered. O.C.G.A. § 51-12-2.[10] "Compensatory damages may be given where the injury is of a character capable of being estimated in money." O.C.G.A. § 51-12-4.

Plaintiff testified that he learned about some of the articles Bailey had written from customers and people he knew in the tree nut industry. (Doc. 50 at 33-34, 42, 58.) To support his request for damages, Plaintiff submitted twelve exhibits at the damages hearing containing the defamatory articles written by Bailey, as well as Plaintiff's correspondences with Bailey. (*See* Docs. 48 & 50 at 30-33.)[11] Plaintiff's testimony was credible, and for purposes of awarding damages, the Court accepts it.

---

[9] Defendant made no argument at the damages hearing or in his post-hearing briefing that Plaintiff should be treated as a "public figure," for which the standard of proof for damages is actual malice. *Id.* Regardless, as explained further herein, the Court also finds that actual malice exists.

[10] "Direct damages are those which follow immediately upon the doing of a tortious act[,]" whereas "[c]onsequential damages are those which are the necessary and connected effect of a tortious act, even though they are to some extent dependent upon other circumstances." O.C.G.A. § 51-12-3.

[11] The articles themselves were admitted over Defendant's objection that they could not be used to supplement the deficient pleadings. The Court overruled the objection finding that the articles were relevant as to the facts to be determined at the hearing and the damages to be awarded. *Id.*

Plaintiff testified that the articles were published on Bailey's website, pecanreport.com, beginning in early 2018. (Doc. 50 at 30-35.) As to Exhibits 1 and 2, which were reports written by Defendant, Plaintiff testified that "almost every statement in [them] is false" including that the reports falsely stated that there was an investigation into a Texas-based co-op, that the co-op had been accused of stealing millions of dollars' worth of pecans, and that Plaintiff was the cofounder of the co-op.  *Id.* at 35-37. Exhibits 3 and 4 show a picture of FBI agents carrying items out of a building and statements about the FBI raiding a Texas pecan cooperative, a cooperative that prior articles stated Plaintiff cofounded. *Id.* at 38-39.[12] The picture was actually from another website and concerned an FBI raid on an entirely different company in California in 2011. *Id.* As a result of these posts, Plaintiff hired a Chicago attorney, who sent a letter to Bailey Plaintiff's request explaining that the articles were defamatory and demanding that Bailey retract the statements and refrain from publishing further false statements that Plaintiff was affiliated with the co-op. *Id.* at 45; Doc. 48-6. Plaintiff testified that he also talked to Bailey about these articles and explained that he was not associated with the co-op. (Doc. 50 at 43-44.) Bailey did not remove the articles and continued to post similar articles. *Id.* at 44-45.

Plaintiff testified that in March 2019, Bailey published an article stating that "there had been a number of complaints made against [Plaintiff] and Navarro [a company] that the American Pecan Council was looking at removing [Plaintiff] from the board." (Doc. 50 at 49-50.) Plaintiff was the vice president of Navarro, and, at the time, Navarro was renegotiating its bank loans. *Id.* After seeing the March 2019 article, the banks were considering not loaning to Navarro, and Plaintiff was asked to come to Texas to resolve the issue. *Id.* A subsequent article by Defendant stated that Plaintiff had been warned about its marketing practices, which contained a picture of Plaintiff, and Plaintiff testified that the statement was "a flat-out lie." *Id.* at 50-51.

---

[12] Exhibits 3 and 4 are not at issue for purposes of general damages as these articles were published prior to the time frame alleged in the Complaint and are not discussed in the Complaint. The Court mentions them here for context and the subsequent letter sent to Defendant informing him that the statements were false. *See also infra* n. 20.

Plaintiff testified that he has lost significant business as a result of Defendant's articles. Many of his customers reduced their buying from Plaintiff's businesses, and one customer stopped buying from him completely. (Doc. 50 at 58-59.) Plaintiff testified that one very large company reduced its purchases by 20%, which amounted to a $25,000 reduction in Plaintiff's commission over two years. *Id.* at 71-73. As a result of this loss, Plaintiff testified that he would like at least $25,000 in compensatory damages. *Id.* In the post-hearing briefing, Plaintiff requests $30,000 in general and special damages,[13] to account for income specifically lost and the other damages incurred as a result of Defendant's tortious acts. (Doc. 51 at 24-25, 36.)

The U.S. Supreme Court long ago recognized "the strong and legitimate state interest in compensating private individuals for injury to reputation" and that the common law "allows recovery of purportedly compensatory damages without evidence of actual loss." *Gertz v. Robert Welch*, 418 U.S. 323, 348-49 (1974). Defendant has not rebutted Plaintiff's showing on this issue or the inference of malice, and it is obvious to the Court that Plaintiff has suffered losses totaling more than $25,000. Thus, finding that Plaintiff has incurred damages in terms of loss income and injury to his reputation as a result of the defamatory articles published by Defendant, the Court awards Plaintiff general and special damages of $30,000.

### ii.   Punitive Damages

In addition to compensatory damages, punitive damages may be awarded "to punish, penalize, or deter a defendant" where "it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b)-(c). "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). Punitive damages for libel may not be awarded where a defendant shows that the libelous statement was published without

---

[13] In his supplemental briefing, Plaintiff indicates that the Court should award additional general damages of $5,000. (Doc. 51 at 77.)

malice or that the plaintiff failed to request that the statement be corrected or retracted. O.C.G.A. § 51-5-11. "The truth of the charge made may always be proved in justification of an alleged libel or slander." O.C.G.A. § 51-5-6. Thus, "a private plaintiff cannot recover punitive damages without a showing of actual malice on the part of the defendant; that is, 'with knowledge that the defamation was false or with reckless disregard of whether it was false or not.'" *Macon Tel. Pub. Co. v. Elliott*, 302 S.E.2d 692, 695 (Ga. Ct. App. 1983) (citation omitted).

Similarly, the U.S. Supreme Court has established that "States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Gertz v. Robert Welch*, 418 U.S. 323, 349 (1974). The Eleventh Circuit has thus found that "the First Amendment to the United States Constitution prohibit[s] the award of punitive damages in a defamation case absent a showing of 'actual malice.'" *Schafer v. Time, Inc.*, 142 F.3d 1361, 1366 (11th Cir. 1998) (citation omitted). "'[A]ctual malice' refer[s] to the speaker's actual or constructive knowledge regarding the truth of the statement," and the term "'malicious,' as it appears in [the Georgia Code], refers to the defendant's statement, and that it requires that statement to be of the type 'deliberately calculated to injure.'" *Id.* (citations omitted). To be clear, "the term malicious modifies only the statement at issue; the defendant's subjective state of mind or intentions towards the plaintiff are irrelevant at this point . . . . [] Any statement can be malicious in the sense that it is of a type calculated to injure, regardless of how the writer feels towards his subject, if it suggests *injurious* (or, more plainly, bad) things about the subject to the ordinary reader." *Id.* at 1367 (citations omitted).

Defendant has made no written arguments regarding mitigation or appropriateness of punitive damages. However, the defense did present mitigating evidence at the damages hearing. For example, the evidence showed that although Plaintiff is not necessarily affiliated with the co-op Pecan Producers International ("PPI"), he admittedly forgot that he is the President of Pecan Producers International, Inc., which is a separate marketing company

located in Texas that markets pecans for PPI and Navarro. (Doc. 50 at 68-69.)[14] Plaintiff testified that this marketing company is "very rarely used" and he forgot about it because they have "never had a meeting." *Id.* Defendant also testified that his "family farms pecans" and that he farmed his own pecan orchard "until it was foreclosed upon due to theft by the co-op." *Id.* at 93-94. Defendant's testimony was not entirely clear, but he attempted to explain his subjective feelings and beliefs about the content of the blog posts. He testified that in 2012 he joined a "company masquerading as a co-op,"[15] which was either Navarro Pecan, Pecan Producers, Inc., Pecan Producers International, or Pecan Producers International, Inc. *Id.* at 94-95. He testified that he had a farm loan when he joined the "co-op," and he sold his pecans to the co-op for what amounted to far less than their market value. *Id.* at 95-96. Apparently, after the farm loan was unpaid, Defendant lost his farm in 2015. *Id.* at 96-97. It also appears to the Court that this is the type of "theft" by the co-op to which Defendant refers. *See id.* at 93-94, 99.

Defendant testified that he started pecanreport.com as early as 2012, and that it "took off very fast" as a source of information in the industry worldwide. (Doc. 50 at 97-98.) He said his articles regarding Plaintiff were "completely true." *Id.* at 102. He believes that Plaintiff is involved with the company masquerading as a co-op, being either Pecan Producers, Inc. or Pecan Producers International, based on Plaintiff's involvement with Navarro and his "intimate knowledge of the inner workings of it." *Id.* at 103. And it further appears that Defendant's assertions that the pecan co-op "stole" millions of dollars worth of pecans was based on Defendant's experiences with the co-op paying far less than market value for farmers' pecans. *Id.* at 94-101. Thus, it appears that not all of Defendant's defamatory statements were published with a reckless disregard for the truth.

However, Defendant was not entirely credible, and the record reflects that he did publish some defamatory statements about Plaintiff with reckless disregard for their truth or

---

[14] On direct examination, Plaintiff testified that he is or has been affiliated with several entities in the tree nut industry, including Navarro, NYM, and Nature's Finest Foods (which is his own business), and he testified that he is on the board of the American Pecan Council ("APC") and the National Pecan Shellers Association. (Doc. 50 at 57, 59, 60.)

[15] Defendant also testified that it is "not a co-op" and that it is misleading to call it a "co-op." (Doc. 50 at 94, 103.) Thus, Defendant's articles associating Plaintiff with a co-op are admittedly false and misleading.

falsity. For example, although the Court finds that Defendant may have genuinely been confused initially as to which Pecan Producers entity Plaintiff was involved with (Docs. 48-1, 48-2, 48-5), he has offered no explanation for why he continued to publish articles about Plaintiff that contained false information. Letters and other correspondences were sent to Defendant at the same mailing address that Defendant provided in this case as his mailing address (Doc. 13 at 16), but Defendant contends that he did not read them or is not sure if he read them (Doc. 50 at 113-17). Given that "actual malice" includes constructive knowledge of the falsity of one's statements, the failure to read a letter alleging defamation may very well indicate that Defendant was reckless regarding the truth or falsity of his statements.

Following Plaintiff's attorney's letter in April 2018 that Defendant stop publishing the defamatory articles (Doc. 48-6),[16] Defendant published more statements about Plaintiff and the pecan industry which were injurious and appear to be false. In September 2018, he published an article titled "High Level Fraud in the Pecan Industry" beginning with an image that states: "Navarro Pecan - Produce of Mexico," in which Defendant said there was "deception and fraud" by Navarro Pecan Company "shipping Mexican pecans in place of American Pecans," that Zedan of Navarro Pecan had asked about using the American Pecan logo on product from Mexico, and that Zedan "claims that all US shellers mix their product with Mexican pecans and that almost no one could use the new logo." (Doc. 48-7 at 1.) Plaintiff testified about the falsity of these statements, explaining that Navarro buys both Mexican and American pecans, and that he asked the APC about the law regarding the American Pecan logo because it differs from another law regarding marketing of pecans as American. (Doc. 50 at 47-48.) But Plaintiff explained that the APC serves to answer these types of questions in the industry and that Navarro had no issue complying with the law

---

[16] The letter stated, among other things, that Plaintiff was not affiliated with the co-op "as co-founder or otherwise," and that Defendant's statements to that effect "defame and libel him." (Doc. 48-6.) Defendant testified that he was informed that Plaintiff was not the co-founder of the pecan co-op with which Defendant has done business, but Defendant testified that Plaintiff never clarified which entities he was involved with so that Defendant could make those corrections in his articles. (Doc. 50 at 103-104.) It is obvious to the Court that proving one's non-affiliation with an entity would be very difficult and that Defendant was sufficiently notified that such statements were false. In fact, Defendant then started to associate Zedan with Navarro Pecan, a company with which Plaintiff is actually affiliated.

because it could ship and sell American pecans separately. *Id.*[17] In other words, while Navarro does buy and ship Mexican and American pecans, it does not do so fraudulently or illegally. *Id.* Thus, Defendant's statements to the contrary are per se defamatory, and Defendant provided no evidence to show that his statements alleging fraud had a factual basis. *See Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1359 (N.D. Ga. 2003) (showing that actual malice can be proven by circumstantial evidence).[18]

Then, in March 2019, Bailey published another article titled "A Fox in the Henhouse" which begins with an image of Plaintiff speaking and says "[m]any growers have openly discussed the removal of Mr. Zedan from the APC board in the recent meetings" and that "[s]ome pecan growers suggested that Mr. Zedan and Navarro Pecan's involvement in the Pecan Producers CO-OP scam in Texas could be grounds enough for dismissal." (Doc. 48-7 at 2.) The article further states "Mr. Zedan and Navarro Pecan have already been warned by APC staff about using American assets to market their Mexican bought pecans." *Id.* Again, Plaintiff testified that these statements were completely false, and Defendant did not show how these statements had any factual basis. (*See* Doc. 50 at 50-51.)

Even after the filing of this lawsuit, Defendant published another article that "a few bad actors" who were members of the APC board were "there to serve their own interest and not that of the pecan growers." (Doc. 48-9.) While this statement may not be false, it is defamatory and, despite Plaintiff's testimony on the falsity of these issues, Defendant has yet to show how Plaintiff was involved with Defendant and other farmers not receiving a fair market value for their pecans. *Stalvey v. Atlanta Bus. Chronicle*, 414 S.E.2d 898, 900 (Ga. Ct. App. 1992) ("'[A] defamatory statement may be made in indirect terms or by insinuation'. . . .") (citation omitted).[19] Moreover, the article stated that "Navarro Pecan who sits on the APC,

---

[17] Plaintiff further testified that he never said that all US shellers mix American and Mexican pecans. *Id.*

[18] In a defamation action, "courts 'consider their natural and obvious meanings and look to the plain import of the words.'" *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1351 (N.D. Ga. 2018) (finding as defamation per se defendant's statement that plaintiff "appears to be [involved] in insurance fraud" because "the average reader viewing this email could 'reasonably conclude from what is said that the comments are imputing a crime to plaintiff'") (citations omitted).

[19] Similarly, Defendant published an article in February 2018 and not included in the Complaint, titled "FBI Investigates Pecan Co-Op," bearing an image of members of the FBI carrying boxes out of a building. (Doc. 48-3.) Defendant testified that he obtained the image online and put it in his article. *Id.* at 105-107. The image

even had the audacity to send a letter to the staff of the APC asking about the use of the American Pecans logo on Mexican pecans, in order to deceive buyers into believing the pecans are grown by American growers." (Doc. 48-9.) That these statements were published with actual malice is likely given that the Complaint in this action alleges that such statements from prior articles are false and defamatory.[20]

Based on the record before the Court, which includes the numerous false statements published without any factual basis and/or after Defendant was notified that the statements were false and defamatory, the Court finds that Defendant acted with reckless disregard for the truth of these statements; that is, with actual malice. *See, e.g.*, *Simon v. Shearson Lehman Bros.*, 895 F.2d 1304, 1321 (11th Cir. 1990) (affirming jury's finding of actual malice notwithstanding that the district court found that defendant did not have actual knowledge of the falsity of his statements); *Mayfield v. Huffman*, No. 224003WL, 2006 WL 2062086 at *1 (Ga. Super. Ct. Mar. 24, 2006) (awarding punitive and compensatory damages for defendant's defamation in the local media); *Fain v. Firestone Publ'g*, No. 56361 WL, 2000 WL 33312061 at *1 (Ga. Super. Ct. Nov. 6, 2000) (awarding compensatory and punitive damages after a magazine published pictures of plaintiff without her permission); *Hub Motor Co. v. Zurawski*, 278 S.E.2d 689, 691 (1981) (affirming jury verdict of general and punitive damages for libel even though defendants argued that their statements were not false because truth is a factual question for the jury); *cf.* *Peoples v. Guthrie*, 404 S.E.2d 442, 443 (Ga. Ct. App. 1991) (finding no basis for punitive damages where evidence showed the defendant "had reason to suspect" the truth of her statements even though they were actually false).

Indeed, defamation is not without consequence, and punitive damages can be awarded consistent with the First Amendment. *See*, *e.g.*, *Hunt v. Liberty Lobby*, 720 F.2d 631, 650 (11th Cir. 1983) ("[P]unitive damages can be recovered consistently with the first amendment . . .

---

[20] To be clear, even though these statements are not directly at issue in this case, they are relevant for the Court's consideration of whether Defendant acted with actual malice in publishing the defamatory statements at issue and whether punitive damages should be awarded. The Court finds that these statements, in conjunction with the record as a whole, support a finding of actual malice.

is actually from an FBI raid on an entirely different company. (Doc. 48-4.) Defendant testified that he had spoken to other farmers about this, but Defendant gave no evidence indicating that the FBI was actually investigating a pecan co-op, or that Zedan was affiliated with such a co-op. (Doc. 50 at 108.)

."); *McKenzie v. State*, 626 S.E.2d 77, 78 (Ga. 2005) ("[D]efaming and libelous speech 'can, consistent with the First Amendment, be regulated because of their constitutionally proscribable content.'") (quoting *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 381, 383 (1992)); *Echols v. Lawton*, 913 F.3d 1313, 1322 (11th Cir. 2019).

Numerous factors should be considered in determining an appropriate punitive damages award, including "(1) the degree of reprehensibility of the defendant's misconduct; (2) the ratio between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1288 (11th Cir. 2018) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575-83 (1996)). While courts have discretion, an award that is "grossly excessive" violates due process. *BMW of N. Am., Inc.* at 568. "The reprehensibility of the defendant's conduct is the 'dominant consideration' in assessing whether a jury's punitive damages award is excessive." *McGinnis*, 901 F.3d at 1288 (citing *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008)). "To determine reprehensibility, the Supreme Court has instructed courts to consider several sub-factors: (1) whether the harm caused was physical or economic; (2) whether the conduct evinced an indifference to or reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions rather than an isolated event; and (5) whether the conduct involved intentional malice, trickery, or deceit rather than mere accident." *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)).

A review of the relevant factors here reveals that while Defendant's conduct was reprehensible, it was not so egregious that punitive damages of 3.3 to 4 times the general and special damages would be warranted. The harm caused to Plaintiff was economic and reputational harm, and there is no evidence that the harm was very substantial given that Plaintiff has continued in his enterprises and board memberships in the tree nut industry. At most, Plaintiff suffered mild distress, some damage to his reputation, and loss of some business opportunities. Furthermore, at least some of the defamatory statements may have been published with a good faith, reasonable belief in their truth (rather than with trickery and

deceit), and Defendant is a student who has previously indicated he does not have large financial means.[21] Given all of these factors, the Court finds that a punitive damages ratio of 1:1 with the general and special damages is appropriate. The Court's reasoning and conclusion are consistent with those of other courts in similar cases. *See*, *e.g.*, *Ledbetter v. United Ins. Co. of Am.*, 845 F. Supp. 844, 849 (M.D. Ala. 1994) (affirming punitive damages equal to one-third of the compensatory damages considering that the defamation was intentional and caused reputational damage and that defendant (a company) had significant financial means); *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1257 (M.D. Fla. 2007) (reducing jury's damage award for "damage to reputation and mental and emotional pain and suffering" as excessive); *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 429 (reversing a punitive damages award that "was neither reasonable nor proportionate to the wrong committed, and [finding] it was an irrational and arbitrary deprivation of the property of the defendant").

Accordingly, punitive damages are assessed against Defendant for $30,000.

### iii.     Attorney's fees

In Georgia, attorneys' fees and expenses may be awarded "where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11; *Joyner v. Raymond James Fin. Servs.*, 602 S.E.2d 871, 875 (2004). "The bad faith referred to in O.C.G.A. § 13-6-11, in actions sounding in tort, means bad faith in the transaction out of which the cause of action arose." *Windermere, Ltd. v. Bettes*, 438 S.E.2d 406, 409 (1993) (citation omitted). "'Indicative of whether a party acts in good or bad faith . . . is his abiding by or failing to comply with a public law made for the benefit of the opposite party, or enacted for the protection of the latter's legal rights.'" *Id.* (citation omitted). In addition, "recovery of attorney fees for stubborn litigiousness is not authorized where there is a bona fide controversy." *Patton v. Turnage*, 580 S.E.2d 604, 607 (2003). "It is only necessary to the

---

[21] A party's indigency is a relevant consideration and where indigency is established, it can serve to mitigate an award. *See Desisto Coll., Inc. v. Howey-in-the-Hills*, 718 F. Supp. 906, 921 (M.D. Fla. 1989). Defendant has not shown that he is actually indigent, and he has retained counsel in this case. Nonetheless, the record reflects that he is a full-time student (Doc. 50 at 92-93) who lost his pecan farm in 2015. For all of the reasons explained herein, the Court finds that it would be unjust to award $100,000 in punitive damages.

plaintiff's recovery that he show any one of these three conditions exists. Further, an award of attorney fees under O.C.G.A. § 13-6-11 is to be affirmed if there is any evidence to support it." *Id.*

Plaintiff has specifically pleaded for attorney's fees based on section 13-6-11 and the elements warranting fees. (Doc. 1 at 8, 13.) As shown above, Defendant's bad faith in the underlying conduct is evidenced by his continuing to publish defamatory articles after being informed that their content was false and defamatory. Indeed, it is well-established Georgia law that "[e]very intentional tort invokes a species of bad faith that entitles a person wronged to recover the expenses of litigation including attorney fees. *LN W. Paces Ferry Assocs., LLC v. McDonald*, 703 S.E.2d 85, 90 (2010) (finding "substantial" attorney's fees appropriate where defendant's underlying actions were knowing and willful). Further, Defendant has been stubbornly litigious and caused Plaintiff the expenses incurred in this lawsuit by publishing articles and refusing to retract his statements even after being warned by Plaintiff's counsel that failure to do so would result in further legal action. (Doc. 50 at 52, 104:7-11, 114-16; Doc. 48-6.) Though Defendant testified that the articles were true, he has already been deemed to admit the well-pled allegations in the Complaint of libel and Defendant's bad faith in publishing the defamatory articles is sufficient to warrant attorney's fees. *See, e.g.*, *Windermere, Ltd. v. Bettes*, 438 S.E.2d 406, 409 (Ga. Ct. App.1993) (affirming verdict of damages and bad faith fees where there was "evidence of bad faith" in defendant's underlying conduct even though there was a bona fide ground to contest liability).

Further, the Court does not find that there was a bona fide controversy here because Defendant has failed to provide evidence either in discovery or at the damages hearing showing that he reasonably believed that all of the allegedly defamatory statements were true. *Patton*, 580 S.E.2d at 608 (finding that the "jury was authorized to determine that [defendant] had been stubbornly litigious in failing to pay his bill, which he never truly disputed"); *see also Brannon Enters., Inc. v. Deaton*, 285 S.E.2d 58, 61 (Ga. Ct. App. 1981) (finding that even if defendant did not act in bad faith in the underlying conduct, where he did not answer the complaint, there was no bona fide controversy). To constitute a "bona fide controversy," there must be a "genuine dispute" of law or fact. *Dimambro Northend Assocs. v. Williams*, 312 S.E.2d

386, 392 (Ga. Ct. App. 1983) (finding a bona fide controversy to exist where experts on both sides testified to such on the issue of causation).

To recover attorneys' fees, an attorney must prove the value of his services, usually through opinion testimony, and demonstrate reasonable attorney's fees for the case. *Patton*, 580 S.E.2d at 608; *Brannon Enters.*, 285 S.E.2d at 61. At the damages hearing, Plaintiff's lead counsel William Sheppard testified regarding the value of his services and reasonableness of the fees sought. (Doc. 50 at 78-.) He testified that he has been practicing commercial litigation in Georgia since 1992 and became a partner at his first firm in 2001. *Id.* at 78-79. He then opened a new commercial litigation office in 2010. *Id.* at 79-90. He testified that he has been lead counsel on this case for Plaintiff and has been assisted by two lawyers and one assistant/paralegal, who he asserted had very limited roles assisting him in this case. *Id.* at 80-81. Defendant's counsel stated that he was satisfied with opposing counsel's credentials and his oversight of support professionals and staff. *Id.* at 82. Plaintiff's counsel testified that he spent 68.6 hours on this case, that partner Alec Sedki spent 0.8 hours assisting with preparing the complaint, that first-year lawyer Adam Wittenstein spent 2.5 hours related to the motions to compel, and that his paralegal Connie Bush spent 0.6 hours primarily in arranging service on Defendant. *Id.* at 83.

Attorney Sheppard testified that the Court has determined that $350 is a reasonable rate for him in this case, and that he believes the following hourly rates should apply for the other attorneys and staff involved: $300 for Alec Sedki, $175 for Adam Wittenstein, and $100 for Connie Bush. (Doc. 50 at 83.) Attorney Sheppard testified that these rates and hours yield a reasonable attorney's fee award of $24,747.50. *Id.* He further testified that expenses in this case totaled $1,728.76, of which just over $1,000 was based on the attempts to serve Defendant. *Id.* at 83-84. Thus, the total attorney's fees and expenses are $26,476.26. *Id.* at 84-85. Attorney Sheppard further testified that Plaintiff has personally incurred $1,523.69 and $964.39 in expenses for his travel to Georgia for this case. *Id.* at 85. Exhibits documenting the hours and expenses were admitted. (Docs. 48-10 & 48-12.) On cross examination, Attorney Sheppard also testified that "the libel and the slander claim are substantially overlapping, the facts are intertwined, so I don't think there is any way to allocate, and I don't think there is

21

any requirement of the law to allocate." *Id.* at 87. Indeed, the slander and emotional distress claims were based on the same conduct alleged for libel in the Complaint, resulted in minimal additional legal work unrelated to the libel claim, and are so intertwined with the libel claim that allocation of hours is not practicable or required under the circumstances. (Doc. 51 ¶¶ 96-100.) Furthermore, Defendant raised no evidence or argument to rebut the reasonableness of the fees sought,[22] and the Court finds based on Plaintiff's arguments, the Court's own experience, and the applicable law that the hours expended on this case, the hourly rates sought, and the expenses incurred are necessary and reasonable. *See Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 735 F. Supp. 1555, 1576 (M.D. Ga. 1989) (finding that section 13-6-11 allows recovery for "expenses of litigation," including for in-house non-attorney expenses).

Accordingly, the Court awards to Plaintiff fees and expenses totaling $28,964.34 as follows: $24,747.50 in attorneys' fees, $1,728.76 in attorneys' expenses, and $2,488.08 in expenses to Plaintiff.

### iv.    Injunctive Relief

In his Complaint and testimony at the hearing Plaintiff sought injunctive relief, including that Bailey be required to remove the defamatory posts from his website. *See Docs.* 1 at 11-13; 28; 50 at 74. Given Georgia courts' "firm policy to protect the right of free speech, [they] apply the general rule that 'equity will not enjoin libel and slander.'" *Cohen v. Advanced Med. Grp.*, 496 S.E.2d 710, 711 (Ga. 1998) (citation omitted). An injunction of libel is only appropriate where the movant "carr[ies] the heavy burden to show that it would be irreparably harmed by [defendant's] communications." *Id.*; *Int'l Auto Logistics, LLC v. Vehicle Processing Ctr. of Fayetteville, Inc.*, No. 2:16-CV-10, 2017 U.S. Dist. LEXIS 5461, at *21 (S.D. Ga. Jan. 13, 2017) (It is "the extremely rare case where an injunction against false or misleading speech comports

---

[22] Although Plaintiff bears the initial burden of proving the reasonableness of the fees and expenses sought, many courts have concluded that "the losing party bears the burden of proof as to items that are not within the exclusive knowledge of the prevailing party." *Crouch v. Teledyne Cont'l Motors, Inc.*, No. 10-00072-KD-N, 2013 U.S. Dist. LEXIS 8514, at *51 (S.D. Ala. Jan. 17, 2013). In other words, if Defendant had any objections, he should have made them in his post-hearing briefing. *A. L. v. Jackson Cty. Sch. Bd.*, 635 F. App'x 774, 786-87 (11th Cir. 2015) ("[D]istrict courts are not required to 'mine' the record looking for evidence not presented by the parties . . . . [Defendants] waived their claims by failing to brief them, . . . and failing to bring to the court's attention evidence that supported their claims. Nor [is] the district court somehow obligated to do [defendants'] job for them.") (citations omitted).

with Georgia's constitutional values."). In noticing Plaintiff of this standard, the Court previously denied without prejudice Plaintiff's request for an injunction but noticed the Parties that they "may present evidence regarding Plaintiff's request for an injunction at the damages hearing." (Doc. 32 at 9-10.) Although Plaintiff testified at the damages hearing that he would like the defamatory articles removed from the internet (Doc. 50 at 74), Plaintiff's proposed conclusions of law filed by counsel make no mention of an injunction. Thus, because Plaintiff has not shown that an injunction is warranted here, an injunction will not issue.

     **v.**     **Sanctions**

The Court previously granted Plaintiff's three motions to compel. (*See* Docs. 25, 27, 32, 54.) As to the first motion to compel, Defendant was heard on the issue of attorney's fees and expenses, and the Court ordered that Defendant pay $1,575.00 in attorney's fees by January 17, 2020. (Doc. 32 at 11-12.) The Parties have made no further comments about the fees ordered on the first motion to compel, so the Court has awarded fees and expenses herein based on the arguments and evidence filed during and after the damages hearing. The Court does not intend to require Defendant to double-pay any fees or expenses, and the Parties shall file an appropriate motion within fourteen days of entry of this Order if there is an error to that effect in the fee award. Having awarded the full fees and expenses sought, the Court will award no further fees or expenses for Plaintiff's second and third motions to compel.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that Plaintiff sufficiently pled libel, that Defendant Bailey committed the tort of libel against Plaintiff, and that damages and costs shall be taxed against Bailey as follows:

$30,000 – general and special damages

$30,000 – punitive damages

$28,964.34 – attorney's fees and expenses.

The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff consistent with this Order.

**SO ORDERED**, this 18th day of February 2021.

<u>/s/ W. Louis Sands</u>
**W. LOUIS SANDS, SENIOR JUDGE**
**UNITED STATES DISTRICT COURT**